The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number:_____

Filing Date: May 14, 2025

**No. A-1-CA-40747**

**STEPHANIE GARCIA RICHARD,**
**COMMISSIONER OF PUBLIC LANDS**
**OF THE STATE OF NEW MEXICO,**

      Plaintiff-Appellant,

v.

**MARATHON PETROLEUM**
**CORPORATION,**

      Defendant-Appellee,

and

**BC & D OPERATING, INC.; DOMINION**
**PRODUCTION COMPANY, LLC;**
**NACOGDOCHES OIL AND GAS, INC.;**
**NORDIC OIL USA 2, LLLP; DOE**
**CORPORATIONS 1-10; DOE LIMITED**
**LIABILITY COMPANIES 1-10; and DOE**
**PARTNERSHIPS 1-10,**

      Defendants.

**APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Matthew J. Wilson, District Court Judge**

New Mexico State Land Office
Ari Biernoff, General Counsel
Richard H. Moore, Associate Counsel
Santa Fe, NM

for Appellant

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Earl E. DeBrine, Jr.
Elizabeth A. Martinez
Deana M. Bennett
Jamie L. Allen
Albuquerque, NM

for Appellee

**OPINION**

**BOSSON, Justice, retired, sitting by designation.**

{1}     The New Mexico Commissioner of Public Lands (the Commissioner) is entrusted with executing and issuing "leases for the exploration, development and production of oil and natural gas" on state trust lands. NMSA 1978, § 19-10-1 (1941). In exchange for the right to explore, develop, and produce oil or gas, lessees make royalty payments to the State of New Mexico (the State). NMSA 1978, §§ 19-10-4.1, -4.2, -4.3 (1985). With the Commissioner's approval, lessees may assign their lease to other oil and gas producers, who, in turn, may reassign the lease to additional producers. NMSA 1978, § 19-10-13 (1951). Upon the Commissioner's approval of a lease assignment, the assignor is "relieved from all obligations to the state with respect to the lands embraced in the assignment." *Id.*; *see* 19.2.100.43 NMAC. The term "obligations" is not defined by statute.

{2}     In this case, the current Commissioner seeks damages and other remedies for damage to leased land allegedly caused by Tesoro Petroleum Company (Tesoro) when it held leases to state trust lands—damage that allegedly occurred before the former Commissioner approved Tesoro's lease assignments. The current Commissioner sued Marathon Petroleum Corporation (Marathon) for the alleged damage on the theory that Marathon is Tesoro's successor in interest. The Commissioner's complaint includes claims for breach of contract and tortious

conduct. The district court granted Marathon's motion to dismiss all of the Commissioner's claims against Marathon for failure to state a claim.

{3} The Commissioner's appeal presents two issues. First, we decide when the Commissioner may sue in tort and under statute for damage to public lands. Marathon argues, and the court below agreed, that no tort duty may exist where that duty is also imposed by contract. Second, we decide a matter of first impression: whether the Commissioner's approval of lease assignments relieves assignors not only of their contractual obligations, but also of obligations arising under statute and the common law. The district court agreed with Marathon that Tesoro's assignment of the oil and gas leases in this case relieved Marathon of all of its obligations to the State with respect to the land embraced in the leases, including obligations arising under New Mexico common law and statutes. For the following reasons, we reverse the district court and remand for further proceedings consistent with this opinion.[1]

**BACKGROUND**

{4} At the center of this case are two expired oil and gas leases, X0-0662 and B0-1276 (the Leases), issued by a former Commissioner in 1922 and 1932, respectively.

---

[1]The Commissioner does not contest the dismissal of her breach of contract claim. We therefore affirm the district court's dismissal with prejudice as to this claim only. *See, e.g.*, *Hall v. City of Carlsbad*, 2023-NMCA-042, ¶ 5, 531 P.3d 642 (providing that "there is a presumption of correctness in the rulings and decisions of the district court," and it is therefore "the appellant's burden to persuade us that the district court erred" (internal quotation marks and citation omitted)).

The Leases encompass roughly 560 acres of state trust land in McKinley County and were assigned to Tesoro in, or around, 1964. By this time, the Leases had both been incorporated into the Hospah Field Sand Unit (the Unit), under which multiple oil and gas leases were jointly managed. Tesoro served as the Unit's operator from approximately 1964 to 1988. At some point between 1988 and 1993, Tesoro assigned the Leases to another company.

{5}     The Commissioner filed suit against Marathon, as well as other oil and gas companies that are not party to this appeal, alleging negligence, trespass, and waste per se under NMSA 1978, Section 19-6-3 (1912); common law negligence, trespass, and waste; breach of contract; and seeking damages, as well as declaratory and injunctive relief pursuant to the Declaratory Judgment Act, NMSA 1978, §§ 44-6-1 to -15 (1975). Significant to this appeal, the Commissioner alleges that the leased state trust lands were damaged and otherwise not properly remediated by Tesoro, who allegedly left behind numerous oil spills, unplugged wells, and abandoned infrastructure. The Commissioner alleged that Marathon acquired Tesoro, or is otherwise Tesoro's successor in interest, and is therefore derivatively liable for damage to the leased land caused by Tesoro during its tenure as lessee.[2]

---

[2]In support of its motion to dismiss, Marathon asserted that it is not Tesoro's successor in interest. The dispute over this point is not relevant at this stage of the proceedings. *See, e.g.*, *Delfino v. Griffo*, 2011-NMSC-015, ¶ 9, 150 N.M. 97, 257 P.3d 917 (providing that, at the motion to dismiss stage, "we accept all well-pleaded

{6}     Marathon filed a motion to dismiss the complaint for failure to state a claim under Rule 1-012(B)(6) NMRA, arguing that Marathon had been relieved of all of its obligations to the State under the terms of the Leases when the former Commissioner approved Tesoro's assignment of the Leases in, or before, 1993. Marathon's argument was based on its interpretation of (1) the Leases; (2) Section 19-10-13, a statute governing the assignment of oil and gas leases; and (3) 19.2.100.43 NMAC, a State Land Office (SLO) regulation controlling the effect of the Commissioner's approval of lease assignments. Although the precise language used varies across these sources, they all generally provide that when the Commissioner approves an assignment of an oil and gas lease, "the assignor shall stand relieved from all obligations to the state with respect to the lands embraced in the assignment." *See* § 19-10-13; 19.2.100.43 NMAC. This phrase, Marathon argued, relieved it of its common law and per se tort duties as well as its contractual duties arising under the Leases.

{7}     In response, the Commissioner did not oppose dismissal of her breach of contract claim against Marathon due to Tesoro's assignment of the Leases between 1988 and 1993. The Commissioner defended, however, the viability of her common law and per se tort claims against Marathon. In its reply, Marathon presented a new

factual allegations in the complaint as true and resolve all doubts in favor of sufficiency of the complaint" (internal quotation marks and citation omitted)).

argument that the Commissioner could not state her common law or per se tort claims because the Leases imposed contractual duties that encompassed the alleged per se and common law duties, thereby foreclosing the Commissioner's ability to sue in tort.

{8} The district court agreed with Marathon and granted its motion to dismiss with prejudice, entering partial final judgment in Marathon's favor pursuant to Rule 1-054(B) NMRA. In its order, the district court concluded that the Commissioner's common law and per se tort claims were barred because (1) "Tesoro Petroleum Corporation and its alleged successor Marathon, were relieved of all obligations to the State (or lessor) with respect to the lands embraced in the [L]eases" upon the Commissioner's approval of Tesoro's assignment; and because (2) "no duty in tort can be imposed where the same duties and obligations are specifically defined by the parties' contract, and the Commissioner's tort claims are based upon the same facts and seek the same relief as her contract claims, which the Commissioner conceded should be dismissed." The Commissioner appealed, and this Court held oral argument.

**STANDARD OF REVIEW**

{9} We review de novo a district court's decision to grant a motion to dismiss for failure to state a claim. *Delfino v. Griffo*, 2011-NMSC-015, ¶ 9, 150 N.M. 97, 257 P.3d 917. "[W]e accept all well-pleaded factual allegations in the complaint as

true and resolve all doubts in favor of sufficiency of the complaint." *Id.* (internal quotation marks and citation omitted). "Dismissal under Rule 1-012(B)(6) is appropriate only where the non-moving party is not entitled to recover under any theory of the facts alleged in their complaint." *Richey v. Hammond Conservancy Dist.*, 2015-NMCA-043, ¶ 25, 346 P.3d 1183 (internal quotation marks and citation omitted).

{10} Resolving the Commissioner's appeal requires that we interpret the language of the Leases, Section 19-10-13, and 19.2.100.43 NMAC—questions of law that we review de novo. *See Rivera v. Am. Gen. Fin. Servs., Inc.*, 2011-NMSC-033, ¶ 27, 150 N.M. 398, 259 P.3d 803 ("Contract interpretation is a matter of law that we review de novo."); *Marbob Energy Corp. v. N.M. Oil Conservation Comm'n*, 2009-NMSC-013, ¶ 7, 146 N.M. 24, 206 P.3d 135 ("Statutory construction is a question of law."); *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 24, 147 N.M. 583, 227 P.3d 73 (providing that interpretation of a regulation is a question of law subject to de novo review).

**DISCUSSION**

**I.      The Commissioner's Complaint Alleges Tortious Breach of Duties Independent of the Contractual Duties in the Leases**

{11} We begin by addressing the district court's conclusion that the Commissioner's tort claims should be dismissed because "no duty in tort can be imposed where the same duties and obligations are specifically defined by the

6

[Leases], and the Commissioner's tort claims are based upon the same facts and seek the same relief as her contract claims, which the Commissioner conceded should be dismissed." Marathon defends this conclusion on appeal, arguing that the Commissioner's tort claims were properly dismissed because these claims "not only arise from the same facts [as her breach of contract claim] but the same rights and obligations under the Leases." The Commissioner disagrees, citing Section 19-6-3 and New Mexico precedent addressing negligence and trespass to argue that she has sufficiently pled "causes for action for the breach of duties arising independently of the Leases." For the following reasons, we agree with the Commissioner.

{12} The district court appears to have concluded, and Marathon seems to argue, that the Commissioner's tort claims cannot be sustained in part because they arise from conduct that would also constitute a breach of contract under the Leases. However, "[u]nder some circumstances, breach of a contractual duty may give rise to an independent action in tort." *Bernalillo Cnty. Deputy Sheriffs Ass'n v. Cnty. of Bernalillo*, 1992-NMSC-065, ¶ 13, 114 N.M. 695, 845 P.2d 789. Our courts have accepted this principle since before statehood. *See De Palma v. Weinman*, 1909-NMSC-009, ¶ 14, 15 N.M. 68, 103 P. 782 (recognizing that "in many cases, an action for tort or an action as for breach of contract may be brought by the same party on the same state of facts" (internal quotation marks and citation omitted)); *cf. Stern v. Farah Bros.*, 1913-NMSC-014, 17 N.M. 516, 529, 133 P. 400, 404 ("It is a general

7

rule that, where there is a breach of duty which is imposed upon one by law, [the] plaintiff may, at [their] election, sue and declare upon the expressed or implied contract, or for the tort."). The question before us, then, is whether the Commissioner's per se and common law tort claims allege a violation of legal duties existing independently of the Leases, or whether, as Marathon argues, these claims arise solely from contractual duties under the Leases. We turn to the complaint for our answer.

## A.      The Commissioner's Common Law Tort Claims

{13}      The Commissioner alleges that Marathon and the other defendants "committed the torts of trespass and waste under the common law" and "acted negligently in their respective operations on the [s]ubject [l]ands, including by failing to plug wells, remediate spills, remove debris, and restore those lands." Our task is determining whether, as a matter of law, these claims are "based upon a duty other than one imposed by the contract." *See Cottonwood Enters. v. McAlpin*, 1991-NMSC-044, ¶¶ 10-12, 111 N.M. 793, 810 P.2d 812 (considering whether a complaint stated a claim for negligence based on a breach of duty independent of the duties arising under a contract between the parties).

{14}      The Commissioner's common law tort claims do not arise from contractual duties under the Leases. Instead, the Commissioner alleges a breach of common law duties independent of contract: negligence, trespass, and waste. *See Milliron v. Cnty.*

8

*of San Juan*, 2016-NMCA-096, ¶ 11, 384 P.3d 1089 (providing that a common law negligence claim "requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages" (internal quotation marks and citation omitted)); *North v. Pub. Serv. Co. of N.M.*, 1980-NMCA-031, ¶ 4, 94 N.M. 246, 608 P.2d 1128 (identifying "[e]very unauthorized entry upon the land of another [as common law] trespass which entitles the owner to a verdict for some damages"); *Mannick v. Wakeland*, 2005-NMCA-098, ¶¶ 14-15, 138 N.M. 113, 117 P.3d 919 (providing that New Mexico recognizes the common law claim of waste and setting forth its three elements), *aff'd but criticized on other grounds sub nom. Coppler & Mannick, P.C. v. Wakeland*, 2005-NMSC-022, ¶¶ 1, 10-14, 138 N.M. 108, 117 P.3d 914.

{15}     Even though the Commissioner's common law tort claims arise from the same facts as her breach of contract claim, the duties allegedly breached originate from the common law—an extra-contractual source. *See Kreischer v. Armijo*, 1994-NMCA-118, ¶ 6, 118 N.M. 671, 884 P.2d 827 (providing that "the difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law" (alteration, internal quotation marks, and citation omitted)). These duties exist independently of any contractual duties imposed by the

Leases, and therefore may be properly raised as tort claims. *See Cottonwood Enters.*, 1991-NMSC-044, ¶¶ 10-12, 14; *see also McNeill v. Burlington Res. Oil & Gas Co.*, 2008-NMSC-022, ¶¶ 13, 32-34, 38, 143 N.M. 740, 182 P.3d 121 (explaining that "a mineral lease carries with it the right to use as much of the surface area as is reasonably necessary to extract the minerals below," and recognizing that a negligence claim may be brought against a mineral lessee for their "unreasonable, excessive or negligent use of the surface estate" (internal quotation marks and citation omitted)); *Bernalillo Cnty. Deputy Sheriffs Ass'n*, 1992-NMSC-065, ¶ 13 (providing that a "breach of a contractual duty may give rise to an independent action in tort").

{16}    Marathon contends that "the existence of an independent duty in tort does not entitle a party to assert tort claims where a contractual obligation speaks to the same duty." Clearly, however, Marathon is mistaken. Our Supreme Court has rejected this very argument. *See State ex rel. Udall v. Colonial Penn Ins. Co.*, 1991-NMSC-048, ¶ 37, 112 N.M. 123, 812 P.2d 777 (rejecting the argument that "a cause of action [for negligent misrepresentation and fraud] cannot be maintained where the misrepresentation is the same conduct upon which the claim for breach of contract is premised").

{17}    Accordingly, the district court erred by dismissing the Commissioner's common law tort claims on this ground. *See Cottonwood Enters.*, 1991-NMSC-044,

¶¶ 10-12, 14 (holding that a statutory duty of reasonable care existed "independent of any duties or obligations arising out of the contract" between the parties, and reversing the district court for dismissing the complaint for failure to state a claim for negligence).

## B.  The Commissioner's Per Se Tort Claims

{18}  The Commissioner's per se tort claims arise from an alleged violation of Section 19-6-3, which provides, in relevant part, that "any lessee of lands who shall not vacate [the] same within thirty days after expiration or cancellation of [their] lease . . . or any person, association of persons or corporation, whether lessee or not, committing waste upon any state lands . . . shall be guilty of a misdemeanor."[3] It is clear that Section 19-6-3's legal duties are also independent of the Leases' contractual duties. Section 19-6-3 sets forth duties "imposed by law," whereas duties under the Leases are "imposed by agreement." *Kreischer*, 1994-NMCA-118, ¶ 6 (internal quotation marks and citation omitted). The duty not to commit waste imposed by Section 19-6-3 does not arise from Marathon's contractual relationship with the Commissioner; the duty is owed instead by "any person, association of

---

[3]In her brief in chief, the Commissioner argues that she has sufficiently pled the four elements of negligence per se. Because it appears the district court did not engage in any analysis of the negligence per se elements, we decline to consider them in the first instance as it is unnecessary to our disposition. *See OR&L Constr., L.P. v. Mountain States Mut. Cas. Co.*, 2022-NMCA-035, ¶ 46, 514 P.3d 40 ("It is not our practice to address issues unnecessary for the disposition of an appeal.").

11

persons or corporation, *whether lessee or not*." Section 19-6-3 (emphasis added). And Section 19-6-3's requirement that a lessee vacate the land within thirty days of the lease expiring or being cancelled imposes an extra-contractual duty upon a lessee only once their lease ends. Accordingly, we conclude the district court also erred by dismissing the Commissioner's per se tort claims.

{19}    In the alternative, Marathon argues that we should affirm the district court's dismissal of the Commissioner's per se claims as right for any reason. When appropriate, we may affirm "on a ground not relied upon by the district court if (1) reliance on the new ground would not be unfair to the appellant, and (2) there is substantial evidence to support the ground on which the appellate court relies." *Freeman v. Fairchild*, 2018-NMSC-023, ¶ 30, 416 P.3d 264. Marathon presents five alternative grounds for affirmance, none of which persuade us.

{20}    Marathon first argues that Section 19-6-3 "only imposes an obligation on the lessee to protect the leased premises from trespass and waste *committed by others*." We agree with the Commissioner that this argument is unavailing because it relies on the language of a different statute, NMSA 1978, Section 19-6-5 (1912). Marathon does not explain why the language in Section 19-6-5 applies to Section 19-6-3, and we will not speculate as to what Marathon's argument might be. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 ("We will not review unclear arguments, or guess at what [a party's] arguments might

12

be."). We therefore decline to further consider this unclear and undeveloped argument. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53.

{21}     Marathon's second argument—that Section 19-6-3 imposes criminal, not civil, liability—fails for the same reason. Marathon again relies on Section 19-6-5, arguing that because Section 19-6-5 provides that "the attorney general may bring suit for damages caused by any such waste or trespass," only the attorney general can bring suit under Section 19-6-3. But Marathon does not articulate why Section 19-6-5 is relevant to our analysis of Section 19-6-3, and we therefore decline to further consider this argument. *See Elane Photography, LLC*, 2013-NMSC-040, ¶ 70; *Headley*, 2005-NMCA-045, ¶ 15.

{22}     We are similarly unpersuaded by Marathon's third alternative ground for affirmance: that Section 19-6-3 does not apply here because Tesoro held valid leases to the land. Section 19-6-3, however, does apply to lessees. It prohibits waste by "any person, association of persons or corporation, *whether lessee or not*," and prohibits trespass by "*any lessee* of lands who shall not vacate the same within thirty days after expiration or cancellation of [their] lease." *Id.* (emphasis added). It is thus not apparent why, as Marathon asserts, Tesoro would be relieved of its obligation to comply with Section 19-6-3 based on its status as a former lessee. *See Headley*,

2005-NMCA-045, ¶ 15 ("We will not review unclear arguments, or guess at what [a party's] arguments might be.").

{23} We decline to address the merits of Marathon's fourth alternative ground for affirmance—its contention that the statute of limitations on bringing a claim under Section 19-6-3 has "long since expired." Marathon asserts, in conclusory fashion, that the two-year statute of limitations found in NMSA 1978, Section 30-1-8(C) (2022), precludes the Commissioner's per se claims. Marathon assumes, without explanation, that the statute of limitations for criminal trespass applies to the Commissioner's civil claim. This does not amount to a developed argument, and we decline to review it. *See Headley*, 2005-NMCA-045, ¶ 15 (declining to review an argument that was less than one page long and lacked an "explanation of [the party's] argument").

{24} Finally, Marathon argues that the complaint does not allege that Tesoro and Marathon failed to vacate the land. But the Commissioner *does* claim that "[b]y leaving improvements such as tank batteries, pump jacks, surface flowlines, and other abandoned infrastructure on the [s]ubject [l]ands, by leaving wells unplugged, and by failing and refusing to reclaim well pads, [the d]efendants are committing an ongoing trespass." It is not clear from Marathon's argument why terms in the Leases that "(1) prohibit the lessee from removing materials or fixtures placed on the leased premises until obligations due the lessor are satisfied, and (2) provide that any

materials or fixtures remaining after 60 days are deemed abandoned" would bar the Commissioner's per se claims, and we decline to consider it further. *See, e.g.*, *id.* (providing that appellate courts do not review undeveloped or unclear arguments).

{25} Having concluded that the Commissioner's common law and per se tort claims arise from duties independent of the Leases, we hold that the district court erred by dismissing these claims on the ground that "the Commissioner's tort claims are based upon the same facts and seek the same relief as her contract claims, which the Commissioner conceded should be dismissed."

## II. The Effect of Tesoro's Lease Assignments

{26} We now turn to the central issue in this appeal: whether the former Commissioner's approval of Tesoro's assignment of the Leases absolved Tesoro, and therefore Marathon, of its legal liability for damage to the leased land allegedly caused by Tesoro's operations. We begin by reviewing the parties' arguments regarding the language of the Leases, and then turn to their arguments addressing Section 19-10-13 and 19.2.100.43 NMAC.

## A. Limited Tort Liability Must Be Expressly Bargained For

{27} We must first address the parties' dispute over whether a party must expressly contract for limited tort liability. On appeal, the Commissioner argues that it is "black letter law" in New Mexico "that a contract only precludes tort claims related to contractual duties where the contract in question expressly limits such tort

liability." The Commissioner contends that the district court erred in dismissing her tort claims because the terms of the Leases do not expressly limit a lessee's tort liability. We agree.

{28}    It is settled law in New Mexico that parties must specifically and clearly contract for limited liability. *See State ex rel. Udall*, 1991-NMSC-048, ¶ 37 ("[T]he concept of freedom of contract and notions of contractually assumed duties and liabilities can act to limit general tort liability in certain circumstances when limited liability is expressly bargained for."); *Acquisto v. Joe R. Hahn Enters., Inc.*, 1980-NMSC-126, ¶ 7, 95 N.M. 193, 619 P.2d 1237 ("While the law allows one to exculpate [them]self by contract, it will do so only if the exculpation is set forth with such clarity that the intent to negate the usual consequences of tortious conduct is made plain."), *overruled on other grounds by C.R. Anthony Co. v. Loretto Mall Partner*s, 1991-NMSC-070, ¶¶ 13-15, 112 N.M. 504, 817 P.2d 238; *see also Cobb v. Gammon*, 2017-NMCA-022, ¶¶ 41-42, 389 P.3d 1058 (concluding that a negligent misrepresentation claim was not precluded by a sales agreement because the contract did not specifically limit the party's tort liability for the conduct at issue). In the absence of an express limited liability or exculpatory clause, a party is not barred from asserting independent tort claims. *See State ex rel. Udall*, 1991-NMSC-048, ¶¶ 17, 35-39; *Cobb*, 2017-NMCA-022, ¶¶ 41-42.

{29}     Relying primarily on two Tenth Circuit cases—*Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22 (10th Cir. 1984), and *Elliott Industries Ltd. Partnership v. BP America Production Co.* (*Elliot Industries*), 407 F.3d 1091 (10th Cir. 2005)— Marathon argues for a contrary result. For the following reasons, Marathon's argument does not persuade us.

{30}     First, even if we were to agree with Marathon that these federal cases contradict our state case law, we may not stray from our Supreme Court's holdings in *State ex rel. Udall* and *Acquisto*. *See State v. Mares*, 2024-NMSC-002, ¶ 33, 543 P.3d 1198 ("It is axiomatic that our justice system requires strict adherence to vertical stare decisis, which is the principle that lower courts are bound by the precedent of reviewing courts."); *Hovey-Jaramillo v. Liberty Mut. Ins.*, 2023-NMCA-068, ¶ 18, 535 P.3d 747 ("[W]e are not bound by federal court decisions purporting to interpret New Mexico state common or statutory law."), *cert. denied* (S-1-SC-40020, Sept. 12, 2023).

{31}     Moreover, we disagree with Marathon's interpretation that either *Isler* or *Elliott Industries* set forth a meaningfully different standard than *State ex rel. Udall* and *Acquisto*. The Tenth Circuit in *Isler* observed that the parties had expressly bargained for limited liability in their agreement. 749 F.2d at 24. Because of this, the Tenth Circuit concluded that it was error to allow the plaintiff to assert a negligence claim against the defendant that would impose tort liability when it had been

17

"expressly negated by the parties themselves." *Id.* at 23. In the absence of an express agreement to limit liability, however, the Tenth Circuit has recognized that "[a] party may be liable in tort for breaching an independent duty towards another, even where the relationship creating such a duty originates in the parties' contract." *Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1201-02 (10th Cir. 1988). *Elliott Industries* even quotes *State ex rel. Udall* for the proposition that, "[t]he rule in New Mexico is that 'the concept of freedom of contract and notions of contractually assumed duties and liabilities can act to limit general tort liability in certain circumstances when limited liability is expressly bargained for.'" 407 F.3d at 1116 (quoting *State ex rel. Udall*, 1991-NMSC-048, ¶ 37). We conclude that *Isler* and *Elliott Industries* provide no reason to affirm the district court on this point.

{32}     In addition to *Isler* and *Elliott Industries*, Marathon relies on *Rio Grande Jewelers Supply, Inc. v. Data General Corp.*, 1984-NMSC-094, 101 N.M. 798, 689 P.2d 1269, and *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, 115 N.M. 690, 858 P.2d 66, to argue that "liability cannot be premised upon extra-contractual tort duties." But the holding in *Rio Grande Jewelers Supply, Inc.* is simply an illustration of the rule that limited liability must be expressly bargained for. *See Rio Grande Jewelers Supply, Inc.*, 1984-NMSC-094, ¶ 8 (providing that "a claim of pre-contract negligent misrepresentation in suits concerned with sale of goods under the [Commercial] Code" was precluded because "[t]he contract

between the parties . . . specifically provided, in bold-face type, that no warranties except those specifically listed in the contract were granted").

{33}     Like *Rio Grande Jewelers Supply, Inc.*, *Continental Potash, Inc.* provides no basis to deviate from *State ex rel. Udall* and *Acquisto*. Our Supreme Court's discussion of implied covenants in *Continental Potash, Inc.* never addressed the question posed by this appeal: whether, absent an express limitation on tort liability, a party may assert tort claims arising out of extra-contractual duties. *See Continental Potash, Inc.* 1993-NMSC-039, ¶¶ 52-67. Because "cases are not considered authority for propositions not considered," *Britton v. Off. of Att'y Gen.*, 2019-NMCA-002, ¶ 24, 433 P.3d 320, we agree with the Commissioner that *Continental Potash, Inc.* does not support Marathon's position on appeal.

{34}     Accordingly, we reiterate that parties seeking limited liability must expressly contract for it, and any exculpation must be "set forth with such clarity that the intent to negate the usual consequences of tortious conduct is made plain." *See Acquisto*, 1980-NMSC-126, ¶ 7; *accord State ex rel. Udall*, 1991-NMSC-048, ¶ 37; *Cobb*, 2017-NMCA-022, ¶¶ 41-42. Absent such an express bargain for limited liability, we will find no such limitation, and an injured party may pursue a claim for such "tortious conduct."

**B.      The Leases Do Not Contain an Express Limitation on Tort Liability**

{35}      Marathon argues that an express limitation on an assignor's extra-contractual tort liability can be found in the lease terms addressing lease assignments. The Leases provide:

> Upon approval in writing by the lessor of an assignment, *the assignor shall stand relieved from all obligations to the lessor with respect to the lands embraced in the assignment* and the lessor shall likewise be relieved from all obligations to the assignor as to such tract, and the assignee shall succeed to all of the rights and privileges of the assignor with respect to such tracts and shall be held to have assumed all of the duties and obligations of the assignor to the lessor as to such tracts.

(Emphasis added.) Marathon takes the position that "relieved from all obligations" unambiguously means that, upon the Commissioner's approval of the lease assignments, Tesoro was released from its duty to comply with "all obligations with respect to the leased premises regardless of their source," including obligations arising under New Mexico common law and statutes. The Commissioner counters that this language does not constitute an express bargain for limited liability, and the Leases therefore do not preclude her common law and per se tort claims. *See State ex rel. Udall*, 1991-NMSC-048, ¶ 37; *Acquisto*, 1980-NMSC-126, ¶ 7; *Cobb*, 2017-NMCA-022, ¶¶ 41-42. To resolve this dispute, we review the language of the Leases.

{36}      "Our appellate courts have long maintained that oil and gas leases are to be interpreted on appeal under the same rules as other contracts." *Smith & Marrs, Inc. v. Osborn*, 2008-NMCA-043, ¶ 10, 143 N.M. 684, 180 P.3d 1183; *see also Leonard*

20

*v. Barnes*, 1965-NMSC-080, ¶ 26, 75 N.M. 331, 404 P.2d 292 ("An oil and gas lease is merely a contract between the parties and is to be tested by the same rules as any other contract."). We therefore review the lease terms de novo. *See, e.g., Rivera*, 2011-NMSC-033, ¶ 27 ("Contract interpretation is a matter of law that we review de novo.").

{37}     "As with other leases, the primary consideration when construing an oil and gas lease is to give effect to the intention of the parties." *Owens v. Superior Oil Co.*, 1986-NMSC-093, ¶ 5, 105 N.M. 155, 730 P.2d 458; *see also C.R. Anthony Co.*, 1991-NMSC-070, ¶ 15 ("It is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions."). "The purpose, meaning and intent of the parties to a contract is to be deduced from the language employed by them; and where such language is not ambiguous, it is conclusive." *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 23, 299 P.3d 844 (internal quotation marks and citation omitted). "A contract term may be ambiguous if it is reasonably and fairly susceptible to different constructions." *Id.* (alteration, internal quotation marks, and citation omitted). If we determine that a contract "is reasonably and fairly open to multiple constructions, then an ambiguity exists," and dismissal as a matter of law is improper. *See id.* ¶¶ 9-10 (internal quotation marks and citation omitted); *see also Mark V, Inc. v. Mellekas*,

21

1993-NMSC-001, ¶ 13, 114 N.M. 778, 845 P.2d 1232 ("Once the agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact.").

{38}     Contrary to Marathon's position, our Supreme Court has reviewed very similar contract language and found it was ambiguous. In *Mark V, Inc.*, the Court considered whether the phrase "all obligations are hereby canceled" unambiguously meant that "all obligations of the parties, past and future, were rescinded." 1993-NMSC-001, ¶ 17 (internal quotation marks omitted). The Court acknowledged that "[a] full and complete mutual release from all obligations under the contract quite possibly may have been the actual effect intended by the parties to this contract, and if so their contract should be interpreted and enforced accordingly." *Id.* ¶ 19. However, the Court determined that the language "all obligations are hereby canceled" was ambiguous. *Id.* It was not apparent whether the parties "agreed to a complete discharge of any right to compensatory damages for past as well as future nonperformance," *id.*, because the parties to the contract did not clearly express this intent.

{39}     The assignment term in the Leases suffers from a similar ambiguity. It is possible that, as the Commissioner argues, the parties intended "all obligations" to mean all the contractual obligations created by the Leases, and nothing more. It is also possible, as Marathon argues, that the parties intended an assignor to be relieved

22

of all conceivable legal obligations, including common law and statutory tort duties. Additionally, like the language used in *Mark V, Inc.*, it is unclear whether such a release would apply only prospectively or also retroactively, encompassing liability for tortious conduct occurring prior to the Commissioner's approval of an assignment. This portion of the Leases is therefore "reasonably and fairly open to multiple constructions." *ConocoPhillips Co.*, 2013-NMSC-009, ¶ 9 (internal quotation marks and citation omitted).

{40}     We acknowledge that when such an ambiguity is found in a contract, typically "the jury (or [trial] court as the fact[-]finder in the absence of a jury) resolves the ambiguity as an issue of ultimate fact." *C.R. Anthony Co.*, 1991-NMSC-070, ¶ 11; *see also Mark V, Inc.*, 1993-NMSC-001, ¶ 13 ("The factual issues, if any, presented by an ambiguity must be resolved by the jury (or by the judge as fact[-]finder in the case of a bench trial) with the benefit of a full evidentiary hearing."). But because we have determined that the lease assignment term is ambiguous, we are able to conclude—as a matter of law—that the Leases do not express a clear intent to waive an assignor's extra-contractual tort liability in the manner proposed by Marathon. "While the law allows one to exculpate [them]self by contract, it will do so *only* if the exculpation is set forth with such clarity that the intent to negate the usual consequences of tortious conduct is made plain." *Acquisto*, 1980-NMSC-126, ¶ 7 (emphasis added). Here, the parties failed to unambiguously convey this intent, and

the lease assignment term therefore does not relieve an assignor of extra-contractual liability.[4] *See id.*; *State ex rel. Udall*, 1991-NMSC-048, ¶ 37.

**C. Section 19-10-13 Does Not Relieve an Assignor of Tort Liability**

{41} Much like the language in the Leases relieving an assignor from "all obligations," Section 19-10-13 provides that upon the Commissioner's approval of the assignment, assignors are "relieved from all obligations to the state with respect to the lands embraced in the assignment." Marathon argues that "all obligations" includes duties arising under the common law and New Mexico statutes. We review questions of statutory interpretation de novo. *E.g.*, *Marbob Energy Corp.*, 2009-

---

[4]The inclusion of a term in Lease X0-0662 requiring lessees to comply with applicable law and regulations does not change our conclusion. The term provides that "[l]essees, including their heirs, assigns, agents and contractors shall at their own expense fully comply with all laws, regulations, rules, ordinances and requirements of the city, county, state, federal authorities and agencies, in all matters and things affecting the premises and operations thereon." Section 19-10-4.1. Marathon takes the position that Tesoro's assignment of the Leases relieved it of any obligation to comply with this contractual provision, and accordingly, also relieved it of its obligation to comply with all applicable laws, regulations, rules, ordinances and requirements. It is not clear that the parties' inclusion of this term altered Tesoro's legal responsibilities, because "[a] contract incorporates the relevant law, whether or not it is referred to in the agreement." *See State ex rel. Udall*, 1991-NMSC-048, ¶ 30. We are not persuaded that a contract term incorporating applicable law could have the dual effect of extinguishing a party's imperative to otherwise abide by that law once the party's contractual obligations cease. But we decline to further consider Marathon's argument because it fails to cite any legal authority that supports such an extraordinary construction of the term. *See State v. Casares*, 2014-NMCA-024, ¶ 18, 318 P.3d 200 ("We will not consider an issue if no authority is cited in support of the issue, because absent cited authority to support an argument, we assume no such authority exists.").

24

NMSC-013, ¶ 5. "When interpreting a statute, our primary goal is to ascertain and give effect to the intent of the Legislature." *First Baptist Church of Roswell v. Yates Petroleum Corp.*, 2015-NMSC-004, ¶ 9, 345 P.3d 310 (internal quotation marks and citation omitted). We achieve this by first looking to the "plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2007-NMSC-053, ¶ 20, 142 N.M. 533, 168 P.3d 105.

{42}   We heed our Supreme Court's warning that the plain meaning rule's "beguiling simplicity may mask a host of reasons why a statute, apparently clear and unambiguous on its face, may for one reason or another give rise to legitimate (i.e., nonfrivolous) differences of opinion concerning the statute's meaning." *State ex rel. Helman v. Gallegos*, 1994-NMSC-023, ¶ 23, 117 N.M. 346, 871 P.2d 1352. "In such a case, it can rarely be said that the legislation is indeed free from all ambiguity and is crystal clear in its meaning." *Id.* "[W]e must [therefore] examine the context surrounding a particular statute, such as its history, its apparent object, and other statutes in pari materia, in order to determine whether the language used by the Legislature is indeed plain and unambiguous." *State v. Cleve*, 1999-NMSC-017, ¶ 8, 127 N.M. 240, 980 P.2d 23.

## 1.      Section 19-10-13's Plain Language Is Ambiguous

{43}      Neither party provides this Court with a rigorous, plain meaning analysis of Section 19-10-13, although both parties argue that the statute is unambiguous. Much like the Leases, the statute provides that after an oil and gas lease assignment is approved by the Commissioner,

> the assignor shall stand *relieved from all obligations to the state with respect to the lands embraced in the assignment* and the state shall likewise be relieved from all obligations to the assignor as to such tract or tracts, and thereupon the assignee shall succeed to all of the rights and privileges of the assignor with respect to such tracts and shall be held to have assumed all of the duties and obligations of the assignor to the state as to such tracts.

Section 19-10-13 (emphasis added). For its part, Marathon cites numerous out-of-state authorities for the proposition that "all means all," and therefore, according to Marathon, "the phrase 'all obligations' necessarily includes obligations under tort law to conduct operations non-negligently or without waste and the statutory obligation under . . . Section 19-6-5 to protect the leased lands from waste or trespass." The Commissioner responds that "nothing in the plain language of Section 19-10-13 . . . provides that the assignee indemnifies the assignor for the assignor's tortious conduct during the assignor's tenure as lessee." We agree with the Commissioner.

{44}      Even accepting Marathon's argument that "all" is unambiguous, we are still left with the question of what "obligations to the state with respect to the lands

26

embraced in the assignment" means. Because "obligations" is not defined by statute, we "consult common dictionary definitions" to identify the word's ordinary meaning. *State v. Vest*, 2021-NMSC-020, ¶ 14, 488 P.3d 626 (providing that "[w]hen words are not otherwise defined in a statute, we give those words their ordinary meaning absent clear and express legislative intention to the contrary" (alteration, internal quotation marks, and citation omitted)).

{45}    Our review of dictionaries in publication at the time Section 19-10-13 was enacted in 1929[5] does not reveal an unambiguous plain meaning. The 1910 edition of *Black's Law Dictionary* sets forth a number of definitions for "obligation," but the primary definition it provides is "a legal duty, by which a person is bound to do or not to do a certain thing." Henry Campbell Black, *A Law Dictionary* 842 (2d ed. 1910). It additionally defines "obligation" as "[t]he binding power of a vow, promise, oath, or contract, or of law, civil, political, or moral, independent of a promise; that which constitutes legal or moral duty, and which renders a person liable to coercion and punishment for neglecting it." *Id.* at 842-43. The relevant

---

[5]Although Section 19-10-13 has been amended since it was enacted in 1929, these amendments did not affect the language at issue in this case. We therefore review dictionaries in use in 1929 to determine the ordinary meaning of "obligation" at that time. *See Pirtle v. Legis. Council Comm. of N.M. Legislature*, 2021-NMSC-026, ¶ 47, 492 P.3d 586 (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018) for the proposition that it is a "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time [the legislature] enacted the statute" (omissions and internal quotation marks omitted)).

27

edition of *Webster's New International Dictionary* defines "obligation" as "[t]hat which a person is bound to do or forbear; any duty imposed by law, promise, or contract, by the relations of society, or by courtesy, kindness, etc." and "[t]hat which obligates or constrains; the binding power of a promise, contract, oath, or vow, or of law; that which constitutes legal or moral duty." *Webster's New International Dictionary*, 1483 (1st ed. 1923).

{46}    Nothing in these definitions clearly reveals whether the Legislature intended Section 19-10-13 to broadly relieve assignors of "all obligations with respect to the leased premises regardless of their source," as Marathon argues, or whether it intended to relieve assignors only of their contractual obligations under the Leases, as the Commissioner argues. The statute is therefore ambiguous. *See, e.g.*, *State v. Adams*, 2022-NMSC-008, ¶ 10, 503 P.3d 1130 ("A statute is ambiguous when it can be understood by reasonably well-informed persons in two or more different senses." (internal quotation marks and citation omitted)).

{47}    In our view, however, Marathon's proposed plain-meaning interpretation is unreasonable and contradictory. *See Vest*, 2021-NMSC-020, ¶ 20 (providing that appellate courts must review "the purpose, background, and history of the statute to ensure that [a] plain-meaning interpretation does not lead to injustice, absurdity, or contradiction" (internal quotation marks and citation omitted)). First, we observe that Section 19-10-13 is one of approximately seventy statutes governing oil and gas

28

leases on public lands. *See* NMSA 1978, §§ 19-10-1 to -70 (1925, as amended through 1999). Considered in this context, it is doubtful that the phrase "all obligations to the state with respect to the lands embraced in the assignment" in Section 19-10-13 refers to obligations beyond those arising under an oil and gas lease. *See, e.g.*, *Baker v. Hedstrom*, 2013-NMSC-043, ¶ 26, 309 P.3d 1047 (applying the "fundamental rule of statutory construction that all provisions of a statute, together with other statutes in pari materia, must be read together to ascertain the legislative intent" (omission, internal quotation marks, and citation omitted)).

{48}    Second, as the Commissioner argues, under Marathon's interpretation, an assignor could "avoid any ongoing duty to comply with the common-law rules or statutes applying to the leased state trust land." This would include, for example, the statutory prohibitions found in Section 19-6-3 against trespassing upon, or using, state trust land without a lease or approval from the Commissioner, as well as the prohibition found in NMSA 1978, Section 19-6-4 (1912) against removing timber, stone, minerals, oil, gas, salt or other natural products or deposits without approval from the Commissioner. Additionally, under Marathon's interpretation, an assignor who remains the operator of record for one or more wells would be relieved from its duty to operate the wells in accordance with the common law and applicable regulations.

{49} Marathon claims that Section 19-10-13's release "necessarily includes obligations under tort law to conduct operations non-negligently or without waste and the statutory obligation under . . . Section 19-6-5 to protect the leased lands from waste or trespass." But in direct response to the hypothetical consequences posed by the Commissioner, Marathon concedes that it is "not arguing that a release of 'all obligations' means that an assignor can return to land it previously leased and use it for any purpose." Marathon suggests that an assignor could still be held liable if it were to violate Section 19-6-4. But this is irreconcilable with the plain-language interpretation Marathon otherwise urges us to adopt. If "all obligations" truly means *all* obligations, there is nothing in the plain language of Section 19-10-13 indicating that the release is limited to only *some* extra-contractual obligations.

{50} Given our conclusion that Section 19-10-13 is ambiguous, and our concerns regarding Marathon's plain-meaning interpretation, we proceed to consider the statute's purpose. *See Baker*, 2013-NMSC-043, ¶ 11 ("[I]f the plain meaning of the statute is doubtful, ambiguous, or if an adherence to the literal use of the words would lead to injustice, absurdity or contradiction, we will construe the statute according to its obvious spirit or reason." (alteration, internal quotation marks, and citation omitted); *see also van Buskirk v. City of Raton*, 2022-NMCA-040, ¶ 17, 516 P.3d 185 (providing that "[i]t is exceedingly rare to find statutory language crystal clear in its meaning, not vague, uncertain, ambiguous, or otherwise doubtful," and

30

that it is therefore "part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute" (alterations, internal quotation marks, and citations omitted)).

**2.      Section 19-10-13's Purpose**

{51}      "When called upon to interpret statutory provisions giving rise to genuine uncertainty as to what the Legislature was trying to accomplish, we look beyond the language to the purpose of the statute to ascertain legislative intent." *Pirtle v. Legis. Council Comm. of N.M. Legislature*, 2021-NMSC-026, ¶ 17, 492 P.3d 586 (alteration, internal quotation marks, and citation omitted). We "ascertain[] a statute's spirit or reason . . . [by] consider[ing] its history and background, and we read the provisions at issue in the context of the statute as a whole, including its purposes and consequences." *See Lujan Grisham v. Romero*, 2021-NMSC-009, ¶ 23, 483 P.3d 545 (internal quotation marks and citation omitted).

{52}      Neither party presents a comprehensive analysis of Section 19-10-13's purpose, background, or history. The core of Marathon's argument is simply that "all means all," and that "[n]othing suggests that the release is limited to contractual obligations owed 'under the lease' or even 'with respect to the lease.'" However, as already discussed, Section 19-10-13 is part of a statutory scheme governing oil and gas leases on public lands, not torts. *See* §§ 19-10-1 to -70. Reading Section 19-10-13 in context, as we must, provides support for the Commissioner's position that the

Legislature intended to release assignors of their contractual obligations arising under oil and gas leases, and nothing more. *See Baker*, 2013-NMSC-043, ¶ 26 (providing that it is a "fundamental rule of statutory construction that all provisions of a statute, together with other statutes in pari materia, must be read together to ascertain the legislative intent" (omission, internal quotation marks, and citation omitted)).

{53}    We begin our analysis by reviewing the legal landscape in 1929 to ascertain how lease assignments were understood in New Mexico at the time Section 19-10-13 was enacted. *See Sims v. Sims*, 1996-NMSC-078, ¶ 24, 122 N.M. 618, 930 P.2d 153 ("[A]ny law is passed against the background of all the law in effect at the time.").

{54}    When it comes to lease assignments, "[t]he general rule is that, without an express release of the lessee by the lessor, the fact that a lease is assigned does not relieve the lessee of its express covenant[s]." *See Jacob v. Spurlin*, 1999-NMCA-049, ¶¶ 10-11, 127 N.M. 127, 978 P.2d 334. Although no New Mexico cases from before 1929 clearly articulate this rule, it had already been settled in other jurisdictions. *See, e.g.*, *Wilson v. Gerhardt*, 13 P. 705, 705 (Colo. 1887) ("[A] release is not to be implied from the mere fact of [a lessor's] assent to the assignment. A lessee who assigns [their] lease does not thereby discharge [them]self of [their] obligation under it. [They] remain[] liable upon [their] express covenants to pay rent

32

in an action by the lessor."); *McFarland v. Mayo*, 162 P. 753, 755-56 (Okla. 1916) (collecting cases from other jurisdictions for the proposition that a lessee cannot avoid liability under express covenants by assigning their lease); *see also* 5 C.J.S. *Assignments* § 45 (1916) ("It is . . . a general rule that a party to a contract may not, unless authorized by the other party, either in the contract itself, or otherwise, so assign the contract as to escape liability for the performance of acts or duties imposed upon [them] by its terms.").

{55} By 1929, courts in other jurisdictions had applied this principle in cases addressing the assignment of oil and gas leases and sale contracts. *See Sanders v. Sharp*, 25 A. 524, 527 (Pa. 1893) (providing that it cannot "be successfully maintained that the mere assignment of [an oil and gas] lease by the appellant to the Ten Mile Oil & Gas Company discharged him from liability on his covenants therein"); *W. Oil Sales Corp. v. Bliss & Wetherbee*, 299 S.W. 637, 638 (Tex. Comm'n App. 1927) ("When a contract is assignable, a party may assign the benefits of [their] contract to another, and delegate to [their] assignee the performance of [their] obligations under the contract; but [they] remain[] liable for the proper performance of those obligations, unless the other party to the contract consents for the assignment to have the effect of releasing [them].").

{56} We assume our Legislature was aware that, absent an express release, our courts could—and likely would—rule that an assignor of an oil and gas lease would

33

retain responsibility for their express contractual obligations post-assignment. *See Inc. Cnty. of Los Alamos v. Johnson*, 1989-NMSC-045, ¶ 4, 108 N.M. 633, 776 P.2d 1252 ("We presume that the [L]egislature is well informed as to existing statutory and common law."). The Legislature's use of "all obligations" appears to indicate that it was seeking to avoid the application of this common law rule and provide for such a release of obligations imposed by state oil and gas leases. *See id.* (providing that appellate courts will "presume that the [L]egislature intends to change existing law when it enacts a new statute"). Therefore, we are drawn to the conclusion that "all obligations" conveys the Legislature's intent that, upon approval by the Commissioner, an assignor would no longer be bound by either implied or express covenants under the lease—i.e., the assignor would be relieved of *all* of their contractual obligations. But this says nothing about an assignor's obligations under the common law or statute.

{57}    Marathon argues that this interpretation would render the release of obligations "meaningless." We disagree. Under our interpretation, an assignor benefits from no longer being liable for express covenants, such as paying royalties and rent, in the event their assignee fails to satisfy those obligations. *See, e.g.*, *Jacob*, 1999-NMCA-049, ¶¶ 9-12. An assignor would also no longer be obligated under the Leases to "pay for all damages to the range, livestock, growing crops or improvements caused by [their] operations." Instead, as applicable here, the

34

Commissioner may only recover for damages resulting from Tesoro's negligence, not for "all damages," as the Leases would have permitted. Reasonable use of the land, even that which damages the land, will not afford the Commissioner relief. *See McNeill*, 2008-NMSC-022, ¶¶ 33-35 (providing that "only those damages alleged to have resulted from a lessee's unreasonable, excessive, or negligent use are actionable in a negligence claim").

{58} We also consider Marathon's concession at oral argument that its interpretation of Section 19-10-13 would, at times, result in the State needing to fund the remediation of damage done to state trust land as a result of tortious conduct. *See, e.g.*, *Santillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-159, ¶ 17, 143 N.M. 84, 173 P.3d 6 (providing that "[w]e may . . . consider the policy implications of the differing constructions urged on us by the parties . . . as long as we do not second-guess the clear policy of the Legislature" (internal quotation marks and citation omitted)). This is because larger oil and gas companies tend to assign their leases to smaller and less profitable companies, which then reassign the leases to even smaller and less profitable operations. Under Marathon's interpretation, the burden of paying for a former lessee's tortious conduct would be shifted to these assignees, even though they are less likely to have the resources to remediate the land. Marathon acknowledged that this may lead to situations where the State would need to fund such remediation. There is no evidence before this Court that the Legislature

35

intended to subsidize the tortious conduct of oil and gas companies at the expense of New Mexico's taxpayers.

{59}  We therefore hold that Section 19-10-13's release of "all obligations to the state with respect to the lands embraced in the assignment" indicates the Legislature's intent to deviate from the common law rule that an assignor remains bound by express covenants under a lease even after they assign the lease. Thus, under Section 19-10-13, an assignor does not retain *any* contractual obligations under an oil and gas lease once the Commissioner approves their assignment, and an assignee becomes solely responsible for fulfilling those obligations. But this does not relieve an assignor from extra-contractual obligations or liability for past misconduct. The statute simply does not go that far.[6, 7]

---

[6] Marathon also argues that a SLO regulation supports dismissal of the Commissioner's claims, but does not provide any additional analysis beyond the arguments it makes in support of its interpretation of the Leases and Section 19-10-13. Although the language of 19.2.100.43 NMAC differs somewhat from Section 19-10-13 and the Leases, Marathon does not argue that this difference is significant. Because we employ the same principles used in statutory construction when construing a regulation, *see, e.g.*, *Marckstadt v. Lockheed Martin Corp.*, 2010-NMSC-001, ¶ 14, 147 N.M. 678, 228 P.3d 462, and because we have already rejected Marathon's statutory interpretation arguments, we are not persuaded that 19.2.100.43 NMAC provides a basis for dismissing the Commissioner's claims.

[7] Marathon briefly argues that we should affirm because, according to Marathon, the Leases were necessarily deemed to be in good standing when the former Commissioner approved Tesoro's lease assignments. It is unclear from Marathon's argument why this is relevant to the outcome of this appeal. Under Section 19-10-13, it is the Commissioner's approval of a lease assignment—not a lease's "good standing" status—that triggers the release of an assignor's obligations to the State. Given Marathon's failure to present a more developed argument, we

36

## D. The Canon Against Surplusage

{60} Section 19-10-13 also addresses the responsibilities of an assignee after the Commissioner approves a lease assignment. It provides that "the assignee shall succeed to all of the rights and privileges of the assignor with respect to such tracts and *shall be held to have assumed all of the duties and obligations of the assignor* to the state as to such tracts." Section 19-10-13 (emphasis added). We acknowledge that our interpretation of the phrase "all obligations," as it relates to assignors, renders superfluous the Legislature's subsequent use of the word "duties" in the phrase "assumed all of the duties and obligations of the assignor." Section 19-10-13.

{61} Generally, when engaging in statutory interpretation, we apply the canon against surplusage and "construe words and phrases as used in the context of the whole statute and ensure that no part of the statutory language is rendered superfluous." *Coal. for Clean Affordable Energy v. N.M. Pub. Regul. Comm'n*, 2024-NMSC-016, ¶ 24, 549 P.3d 500. But "our preference for avoiding surplusage constructions is not absolute," *Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004), and "canons are not mandatory rules," *State v. Gutierrez*, 2023-NMSC-002, ¶ 41, 523 P.3d 560 (internal quotation marks and citation omitted). Instead, they are "guides designed to help [appellate courts] determine the Legislature's intent as embodied

---

decline to further consider it. *See Headley*, 2005-NMCA-045, ¶ 15; *Elane Photography*, 2013-NMSC-040, ¶ 70.

37

in particular statutory language." *Gutierrez*, 2023-NMSC-002, ¶ 41 (alteration, omission, internal quotation marks, and citation omitted).

{62}    Here, the canon against surplusage is of no assistance in our task of ascertaining legislative intent because, at the time Section 19-10-13 was enacted,[8] "duty" and "obligation" were synonymous and dictionaries defined the words in reference to one another. "Obligation" was defined as "a legal duty, by which a person is bound to do or not to do a certain thing," Black, *supra*, at 842, while "duty" was defined as "[a]n obligation to do a thing," *id.* at 405. More specifically, the 1910 edition of *Black's Law Dictionary* defined a "legal duty" as "[a]n obligation arising from contract of the parties or the operation of the law." *Id.* at 405. A similar issue arises with *Webster's New International Dictionary*. *See Webster's New International Dictionary*, 1483 (1st ed. 1923) (providing that "obligation" and "duty" are synonyms, and defining "obligation" as "any duty imposed by law, promise, or contract, by the relations of society, or by courtesy, kindness, etc." and "that which constitutes legal or moral duty"). At oral argument, when specifically

---

[8]Because subsequent amendments to Section 19-10-13 have not modified the relevant language, we review dictionaries in use at the time the statute was enacted in 1929. *See Pirtle*, 2021-NMSC-026, ¶ 47 (quoting *Wis. Cent. Ltd.*, 585 U.S. at 284 for the proposition that it is a "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time [the legislature] enacted the statute" (omissions and internal quotation marks omitted)).

38

asked about the applicability of the canon against surplusage, both parties took the position that there is no meaningful distinction between the two words.

{63}     Other courts have recognized that "the presumption against surplusage does not apply to doublets—two ways of saying the same thing that reinforce its meaning." *Doe v. Boland*, 698 F.3d 877, 881 (6th Cir. 2012); *accord United States v. Bronstein*, 849 F.3d 1101, 1110 (D.C. Cir. 2017) (recognizing that "sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach" (alteration, internal quotation marks, and citation omitted)); *Milwaukee Dist. Council 48 v. Milwaukee Cnty.*, 2019 WI 24, ¶¶ 24-25, 385 Wis. 2d 748, 924 N.W.2d 153.

{64}     "[R]edundancies are common in statutory drafting—sometimes in a [legislative] effort to be doubly sure, sometimes because of [legislative] inadvertence or lack of foresight, or sometimes simply because of the shortcomings of human communication." *Barton v. Barr*, 590 U.S. 222, 239 (2020). In this case, we agree with the parties that "the better overall reading" of Section 19-10-13 contains such a redundancy. *See Barton*, 590 U.S. at 239 (internal quotation marks and citation omitted).

39

**CONCLUSION**

{65}    For the forgoing reasons, we reverse the district court's dismissal of the Commissioner's common law and per se tort claims and remand for further proceedings consistent with this opinion.[9]

{66}    **IT IS SO ORDERED.**


                                         _____

                                         **RICHARD C. BOSSON, Justice,**
                                         **Retired, Sitting by Designation**


**WE CONCUR:**


_____
**KRISTINA BOGARDUS, Judge**


_____
**ZACHARY A. IVES, Judge**

---

[9] We affirm the district court's dismissal with prejudice as to the Commissioner's breach of contract claim, which the Commissioner does not contest.